828 F.2d 910
 56 USLW 2204, 8 Employee Benefits Ca 2443
 Mary ROSE, Plaintiff-Appellant,
v.
The LONG ISLAND RAILROAD PENSION PLAN, Long Island Railroad
Pension Plan's Board of Managers, Long Island Railroad
Pension Plan's Joint Board on Pension Applications, Morgan
Guaranty Trust Company of New York as Trustee of the Plan,
T.P. Moore and John Doe, as members of the Plan Board of
Managers, T.M. Taranto, J.B. Huff and H.J. Libert, as
members of the Plan Board of Managers and the Joint Board on
Pension Applications, E. Yule, W. Styziak and J. Bove, as
members of the Joint Board on Pension Applications, and the
Long Island Railroad, Defendants-Appellees.
 No. 959, Docket 86-7942.
 United States Court of Appeals,
Second Circuit.
 Argued March 30, 1987.
Decided Sept. 3, 1987.
 
 Edgar Pauk, Legal Services for the Elderly, New York City (David S. Preminger, Rosen, Szegda, Gersowitz, Preminger & Bloom, of counsel), for plaintiff-appellant.
 Eugene P. Souther, New York City (Seward & Kissel, Bruce D. Senzel, Mark J. Hyland and Dan J. Schulman, the Long Island R. Co., Thomas M. Taranto and Roger J. Schiera, of counsel), for defendants-appellees.
 Roger M. Olsen, Asst. Atty. Gen., Washington, D.C. (Michael L. Paup, David English Carmack and B. Paul Klein, Attorneys, Dept. of Justice, William F. Nelson, Chief Counsel, I.R.S., George S. Salem, Solicitor of Labor, Dept. of Labor, Gary M. Ford, Gen. Counsel, Peter H. Gould, Deputy Asst. Gen. Counsel, Kenton Hambrick, Attorney, Pension Benefit Guar. Corp.), for the U.S. amicus curiae.
 Judith A. Gordon, New York City, Asst. Atty. Gen. of the State of N.Y. (Robert Abrams, Atty. Gen. of the State of N.Y.), for the State of N.Y. as amicus curiae.
 Before MESKILL, PIERCE* and ALTIMARI, Circuit Judges.
 ALTIMARI, Circuit Judge:
 
 
 1
 This case brings before us, for the second time, the question of whether the Long Island Railroad's ("LIRR") pension plan is as a "governmental plan" within the meaning of section 3(32) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. Sec. 1002(32), and is therefore exempt from compliance with Title I of that statute. See 29 U.S.C. Sec. 1003(b)(1). The issue arises in the context of Mary Rose's suit for survivor's benefits, to which she claims entitlement pursuant to section 205(a) of ERISA, 29 U.S.C. Sec. 1055(a). Following a remand from this court in 1982, the District Court for the Eastern District of New York (Bramwell, J.) held that ERISA did not apply to the LIRR Pension Plan because it was a "governmental plan." The district court accordingly granted defendants' motion for summary judgment and dismissed Rose's complaint for lack of subject matter jurisdiction.
 
 
 2
 We conclude that during the period of time relevant to this appeal, the LIRR Pension Plan was a "governmental plan," and we affirm the decision of the district court.
 
 BACKGROUND
 
 3
 The story of this litigation begins in 1976 with the death of Richard Rose. Rose had been employed as a clerk by the Long Island Railroad. Although he was fully vested in the LIRR Pension Plan ("the Plan") and had for some months been eligible to retire, Richard Rose was still working at the time of his death.
 
 
 4
 Under the Plan, Richard Rose was entitled to receive a "service-age" pension upon retirement, payable monthly for his lifetime without survivorship benefits. He also had the option of converting the "service-age" benefits into a pension of equivalent actuarial value, payable to the retiree for life and then to the surviving spouse for life. Under the terms of the Plan then in effect, the survivorship option had to be elected in writing at least six months prior to retirement or death. Had Richard Rose elected this option, the monthly benefits payable during his own lifetime would have been reduced to reflect the future payments to his surviving spouse.
 
 
 5
 Richard Rose never elected the survivorship option. After he died, his widow, Mary Rose ("Rose"), applied to the LIRR for survivorship benefits. The Board of Managers of the Plan denied her application because her late husband had not made the required election. The decision of the Board of Managers was subsequently affirmed by the LIRR's Joint Board on Pension Applications.
 
 
 6
 On June 5, 1981, Rose commenced the instant action for survivor's benefits and other relief in the Eastern District of New York, alleging that the LIRR Pension Plan violated section 205 of ERISA, 29 U.S.C. Sec. 1055. That section requires that all retirement plans covered by ERISA must provide benefits to the surviving spouses of employees who die before retirement. Id. Sec. 1055(a)(2). These survivorship benefits are payable unless they are expressly waived by the employee. See id. Sec. 1055(c)(1)(A). It is undisputed that Richard Rose never expressly waived survivorship benefits.
 
 
 7
 The district court concluded that the LIRR Plan was exempt from compliance with ERISA's vesting provisions because it was a "governmental plan" under 29 U.S.C. Sec. 1002(32). On January 4, 1982, the district court dismissed Rose's complaint for lack of subject matter jurisdiction.
 
 
 8
 Rose appealed the dismissal of her complaint, and on September 28, 1982, this court reversed the decision of the district court. We noted that the language of the "governmental plan" exemption was ambiguous, and proceeded to examine the legislative history of ERISA in order to determine whether Congress would have intended the LIRR Plan to be exempt from its coverage. We held that the LIRR Plan was subject to the vesting and participation requirements of ERISA, because such a holding would "not implicate any of the concerns that led Congress to exempt governmental employee benefit plans."
 
 
 9
 Following this court's reversal of the district court, defendants petitioned for rehearing. In support of the petition, both the State of New York and the United States of America filed briefs as amici curiae, taking the position that the LIRR Plan was an exempt "governmental plan." The panel granted rehearing on December 23, 1982, finding that "significant matters exist in this case that were not fully litigated in the district court and that, therefore, were not fully presented on appeal." These "significant matters" included the extensive state funding of the LIRR through the Metropolitan Transportation Authority, and the potential impact on state taxpayers if the LIRR Plan were required to comply with ERISA's funding requirements. Defendants argued that if the financial burden of ERISA compliance were to fall on the taxpayers, then the Congressional concerns behind the "governmental plan" exemption would indeed be implicated.
 
 
 10
 The panel accordingly vacated and withdrew its previously-issued opinion, vacated the decision of the district court and remanded "in order that [the significant] matters might be presented to and considered fully by the district court."
 
 
 11
 On remand, the parties engaged in extensive discovery. In April 1986, defendants moved for summary judgment, still asserting that the LIRR Plan was exempt from ERISA coverage. Rose cross-moved for summary judgment in June 1986.
 
 
 12
 On September 26, 1986, Judge Bramwell issued a brief ruling from the bench, granting defendants' motion for summary judgment, denying plaintiff's cross-motion for summary judgment and once again dismissing her complaint. The district court held:
 
 
 13
 After carefully considering the voluminous submissions of the parties in connection with these motions, the Court is again convinced, as it was back in December of 1981, that the LIRR Plan is and has been at all times relevant to this case a "governmental plan" as defined by Section 1002(32) of ERISA.
 
 
 14
 It is from this dismissal that Mary Rose now appeals.[1]
 
 DISCUSSION
 
 15
 I. The "Governmental Plan" Exemption from ERISA Coverage.
 
 
 16
 ERISA was enacted, after years of study, in order to remedy long-standing abuses and deficiencies in the private pension system. See generally H.R.Rep. No. 533, 93d Cong., 2d Sess., reprinted in, 1974 U.S.Code Cong. & Ad.News 4639. See also 29 U.S.C. Sec. 1001. These deficiencies included inadequate vesting provisions, insufficient assets to assure payment of future benefit obligations, and premature termination of under-funded benefit plans. See id.
 
 
 17
 Title I of ERISA, 29 U.S.C. Secs. 1001 et seq., contains various substantive and procedural requirements with which covered plans must comply. These include standards for vesting, funding and fiduciary responsibility, as well as the survivorship provision under which Mary Rose claims a right to benefits. Title II of ERISA is codified in the Internal Revenue Code, 26 U.S.C. Secs. 401 et seq., and contains requirements pertaining to the qualification of pension plans for favorable tax treatment. Title III, 29 U.S.C. Secs. 1201 et seq., contains ERISA's administrative and enforcement provisions. Title IV, 29 U.S.C. Secs. 1301 et seq., establishes the Pension Benefit Guaranty Corporation ("PBGC"), which guarantees the payment of benefits by plans which terminate with insufficient assets to pay those benefits.
 
 
 18
 Although Congress considered whether ERISA should apply to "public" or "governmental" benefit plans, it ultimately decided to exempt such plans from compliance with most of ERISA's requirements. See H.R.Rep. No. 533, 1974 U.S.Code Cong. & Ad.News at 4647. Instead, Congress decided to undertake further study of the adequacy of public retirement plans, in order to determine "the necessity for Federal legislation and standards with respect to such plans." 29 U.S.C. Sec. 1231(a)(3). To date, no such legislation has been enacted.
 
 
 19
 The governmental plan exemption was included for several reasons. First, it was generally believed that public plans were more generous than private plans with respect to their vesting provisions. H.R.Rep. No. 533, 1974 U.S.Code Cong. & Ad.News at 4667. Second, it was believed that "the ability of the governmental entities to fulfill their obligations to employees through their taxing powers" was an adequate substitute for both minimum funding standards and plan termination insurance. S.Rep. No. 383, 93d Cong., 2d Sess., reprinted in, 1974 U.S.Code Cong. & Ad.News 4890, 4965; H.R.Rep. No. 807, 93d Cong., 2d Sess., reprinted in, 1974 U.S.Code Cong. & Ad.News 4670, 4756-57. Finally, there was concern that imposition of the minimum funding and other standards "would entail unacceptable cost implications to governmental entities." H.R.Rep. No. 807, 1974 U.S.Code Cong. & Ad.News at 4830. See also H.R.Rep. No. 533, 1974 U.S.Code Cong. & Ad.News at 4668.
 
 
 20
 This Congressional reluctance to interfere with the administration of public retirement plans is in part based on principles of federalism. For example, the report of the House Committee on Education and Labor stated:
 
 
 21
 There are literally thousands of public employee retirement systems operated by towns, counties, authorities and cities in addition to the state and Federal plans. Eligibility, vesting, and funding provisions are at least as diverse as those in the private sector with the added uniqueness added by the legislative process. For this reason the Committee is convinced that additional data and study is necessary before any attempt is made to address the issues of vesting and funding with respect to public plans.
 
 
 22
 H.R.Rep. No. 533, 1974 U.S.Code Cong. & Ad.News at 4647. See also Feinstein v. Lewis, 477 F.Supp. 1256, 1261 (S.D.N.Y.1979) (purpose of ERISA governmental exemption was to "refrain from interfering with the manner in which state and local governments operate employee benefit systems"), aff'd, 622 F.2d 573 (2d Cir.1980).
 
 
 23
 The governmental plan exemption from Title I coverage is codified at 29 U.S.C. Sec. 1003(b)(1). "Governmental plan" is defined in 29 U.S.C. Sec. 1002(32), which provides in pertinent part:
 
 
 24
 The term "governmental plan" means a plan established or maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing.
 
 
 25
 The sole issue on this appeal is whether the LIRR Pension Plan was an exempt "governmental plan" in 1976 when Mary Rose applied for survivorship benefits.
 
 
 26
 Rose raises a preliminary issue of statutory construction: she asserts that the phrase "by the government of any State or political subdivision thereof" should be interpreted as meaning the government of any state or the government of a political subdivision of a state. Under Rose's interpretation, a plan which was established or maintained by a political subdivision of a state would only be entitled to the exemption if the political subdivision were itself a government, for example a local government.
 
 
 27
 Defendants, on the other hand, argue that the phrase in question should be read as the government of any state, or a political subdivision of any state. Under this broader interpretation, a political subdivision would not have to be a government itself in order for its benefit plan to be exempt from ERISA coverage. Rather, a plan which was established or maintained by any kind of political subdivision would qualify for the exemption.
 
 
 28
 We acknowledge that the statutory language is ambiguous; however, we are persuaded that defendants' interpretation is the correct one. Defendants' interpretation comports better with a common-sense reading of the statute, and also is a more logical interpretation. Section 1002(32) exempts not only plans "established or maintained ... by the government of any State or political subdivision thereof," but also plans "established or maintained ... by any agency or instrumentality of any of the foregoing." If, as Rose maintains, Congress enacted the exemption primarily to protect the autonomy of state and local governments, then it would not make sense to extend the exemption to state agencies and instrumentalities--which are not governments--while denying the exemption to public authorities.
 
 
 29
 Further support for defendants' interpretation is found in 29 U.S.C. Sec. 1231, the provision which directs Congress to conduct further studies of public retirement plans. The benefit plans which Congress is directed to study include:
 
 
 30
 retirement plans established and maintained or financed (directly or indirectly) by the Government of the United States, by any State (including the District of Columbia) or political subdivision thereof, or by any agency or instrumentality of any of the foregoing.
 
 
 31
 Id. Sec. 1231(a). It is reasonable to assume that these plans are the same "governmental plans," as defined in Sec. 1002(32), which are currently exempt from ERISA coverage under Sec. 1003(b)(1).
 
 
 32
 Section 1231(a) uses the phrase "established and maintained ... by any State ... or political subdivision thereof " (emphasis added). This phrasing does not suffer from the ambiguity of the Sec. 1002(32) definition. By omitting the words "the government of" before the clause "any state ... or political subdivision thereof," section 1231(a) clearly encompasses all political subdivisions of states, whether or not they are governments. The clear meaning of Sec. 1231(a) thus provides an additional key to interpreting the ambiguous language of Sec. 1002(32).
 
 
 33
 Finally, Feinstein v. Lewis, supra, one of the few cases interpreting the governmental plan exemption, held that the exemption applied to employee benefit plans established and maintained by two different school districts. 477 F.Supp. at 1262. School districts are certainly not "governments," in any ordinary sense of the word.
 
 
 34
 We therefore conclude that a retirement plan is exempt from Title I of ERISA if it is established or maintained (1) by the government of a state; (2) by a political subdivision of a state; or (3) by an agency or instrumentality of either of the foregoing.
 
 
 35
 II. The LIRR is an Agency or Instrumentality of the MTA, a Political Subdivision of the State of New York.
 
 
 36
 The Long Island Railroad Company was chartered in 1834 as a private stock corporation, the purpose of which was to provide freight and passenger service to Long Island. In 1966, all of the LIRR's outstanding stock was acquired by the Metropolitan Transportation Authority ("MTA"). Since that time, no private individual has held any beneficial interest in the LIRR.
 
 
 37
 The district court held that the LIRR Plan was an exempt "governmental plan" because "the LIRR is an agency of at least the [MTA], and perhaps of the State of New York ... [and] the MTA is a political subdivision of the State." We agree with the district court that the LIRR Plan fits the statutory definition of a "governmental plan."
 
 
 38
 A. The Metropolitan Transportation Authority
 
 
 39
 Because ERISA is a federal statute, the term "political subdivision" must be interpreted by reference to federal law, in the absence of clear legislative intent to the contrary. NLRB v. Natural Gas Utility District of Hawkins County, Tennessee, 402 U.S. 600, 602-03, 91 S.Ct. 1746, 1748, 29 L.Ed.2d 206 (1971) (quoting NLRB v. Randolph Electric Membership Corp., 343 F.2d 60, 62-63 (4th Cir.1965)). Although the term "political subdivision" is not defined in ERISA, several different sources of authority point to the conclusion that the MTA, which wholly owns the LIRR, is a political subdivision of the State of New York.
 
 
 40
 In Hawkins County, the Supreme Court considered whether the respondent Utility District fell within the political subdivision exception to jurisdiction under the National Labor Relations Act. See 29 U.S.C. Sec. 152(2). To guide its analysis, the Court adopted the NLRB's criteria, which "limited the exemption for political subdivisions to entities that are either (1) created directly by the state, so as to constitute departments or administrative arms of the government, or (2) administered by individuals who are responsible to public officials or to the general electorate." Hawkins County, 402 U.S. at 604-05, 91 S.Ct. at 1749.
 
 
 41
 The Court concluded that the Utility District was a political subdivision under the NLRB criteria. In further support of its decision the Court noted that the District had the power of eminent domain, was a public corporation under state law, and that the District's property and revenues were exempt from all state and local taxes. Id. at 606-07, 91 S.Ct. at 1750. See also Popkin v. New York State Health & Mental Hygiene Facilities Improvement Corp., 547 F.2d 18 (2d Cir.1976), cert. denied, 432 U.S. 906, 97 S.Ct. 2950, 53 L.Ed.2d 1078 (1977) (under the Hawkins County criteria, New York State public benefit corporation was political subdivision within the meaning of pre-1972 exemption from Title VII coverage).
 
 
 42
 The NLRB guidelines are a useful aid in interpreting ERISA's governmental exemption, because ERISA, like the National Labor Relations Act, "represents an effort to strike an appropriate balance between the interests of employers and labor organizations." H.R.Rep. No. 533, 1974 U.S.Code Cong. & Ad.News at 4647. Under the Hawkins County analysis, the MTA is clearly a political subdivision of the state because it satisfies both of the alternate NLRB criteria. The MTA, a public benefit corporation, was created in 1965 by the Metropolitan Transportation Authority Act, N.Y.Pub.Auth.Law Secs. 1260 et seq. See id. Sec. 1263(1)(a). The purposes of the MTA are "the continuance, further development and improvement of commuter transportation and other services related thereto within the metropolitan commuter transportation district." Id. Sec. 1264(1). These purposes are "in all respects for the benefit of the people of the state of New York and the authority shall be regarded as performing an essential governmental function in carrying out its purposes and in exercising the powers granted by this title." Id. Sec. 1264(2). Thus, the MTA meets the first criterion because it was "created directly by the state, so as to constitute [a] department or administrative arm[ ] of the government." 402 U.S. at 604, 91 S.Ct. at 1749.
 
 
 43
 In addition, the MTA is administered by board members who are appointed by the governor with the advice and consent of the senate, and are removable by the governor. N.Y.Pub.Auth.Law Secs. 1263(1)(a) & (7). Thus, the second NLRB criterion is satisfied because the MTA is "administered by individuals who are responsible to public officials or to the general electorate." 402 U.S. at 604-05, 91 S.Ct. at 1749.
 
 
 44
 Additional guidance is provided by two early but significant decisions of this circuit, Commissioner of Internal Revenue v. Shamberg's Estate, 144 F.2d 998 (2d Cir.1944), cert. denied, 323 U.S. 792, 65 S.Ct. 433, 89 L.Ed. 631 (1945), and Commissioner of Internal Revenue v. White's Estate, 144 F.2d 1019 (2d Cir.1944), cert. denied, 323 U.S. 792, 65 S.Ct. 433, 89 L.Ed. 632 (1945), which also required the court to determine whether a particular entity was a political subdivision. See Philadelphia National Bank v. United States, 666 F.2d 834, 837 (3d Cir.1981), cert. denied, 457 U.S. 1105, 102 S.Ct. 2904, 73 L.Ed.2d 1314 (1982) (terming Shamberg and White the leading cases on this issue).
 
 
 45
 Shamberg and White involved determinations of whether interest on bonds issued by the Port of New York Authority and the Triborough Bridge Authority, respectively, were exempt from federal taxation because the issuing entities were "political subdivisions" within the meaning of the controlling Revenue Acts. Both authorities were held to be political subdivisions, because they were created pursuant to state statute in order to carry out the traditionally public function of operating bridges and tunnels; moreover, the State had delegated certain of its sovereign powers to the authorities, including the power of eminent domain and the police power.
 
 
 46
 Like the authorities in Shamberg and White, the MTA performs an "essential governmental function," N.Y.Pub.Auth.Law Sec. 1264(2). It also possesses many other indicia of sovereignty. The MTA has the power of eminent domain, id. Sec. 1267(1). Its property and revenues are exempt from all state and local taxes, id. Sec. 1275. It may establish rules "for the conduct and safety of the public" which preempt local ordinances, id. Sec. 1266(4), and the facilities, activities and operations of the MTA are not subject to the jurisdiction of any local authorities, id. Sec. 1266(8).
 
 
 47
 We see no reason why the Hawkins County and Shamberg analyses should not apply to the term "political subdivision" as used in ERISA. We therefore conclude that the MTA is a political subdivision of the State of New York within the meaning of 29 U.S.C. Sec. 1002(32).
 
 B. The Long Island Railroad
 
 48
 (1)
 
 
 49
 The MTA acquired all the outstanding stock of the LIRR in 1966, pursuant to N.Y.Pub.Auth.Law Sec. 1266(5), which permits the MTA to "cause any one or more of its powers, duties, functions or activities to be exercised or performed by, one or more wholly owned subsidiary corporations." Prior to 1966, the LIRR had been a private stock corporation owned by the Pennsylvania Railroad. The LIRR remained a stock corporation until 1980, when the MTA converted it into a public benefit corporation.
 
 
 50
 N.Y.Pub.Auth.Law Sec. 1266(5) provides that the directors or members of the LIRR "shall be the same persons holding the offices of members of the [MTA]." In addition, the LIRR possesses "all of the privileges, immunities, tax exemptions and other exemptions of the [MTA]." Id. These include all the powers and privileges detailed in the previous section.
 
 
 51
 The MTA acquired the LIRR with funds loaned to it by the state. This loan was subsequently "repaid" by a 1967 state bond issue, a portion of the proceeds of which was appropriated to the MTA to repay the loan. The LIRR's sources of revenue include farebox receipts, freight and miscellaneous revenues, and substantial state and federal subsidies received through the MTA. Since its acquisition by the MTA, the LIRR's income from fares and freight has never been sufficient to meet its expenses, and it has operated at a substantial loss each year, prior to subsidies. For example, according to the 1976 MTA Annual Report, the LIRR had expenses of approximately $254 million but revenues of only $134 million in that year.
 
 
 52
 Each year, the LIRR prepares its budget for the following calendar year and submits it, along with its "projected operating and capital subsidy requirements," to the MTA for approval. The MTA then submits such of the LIRR's requests as it approves, along with its own operating and capital subsidy requirements, to the State Division of the Budget. Between 1967 and 1976, the LIRR received more than $450 million in subsidies through the MTA. In United Transportation Union v. Long Island Rail Road Co., 634 F.2d 19 (2d Cir.1980), rev'd on other grounds, 455 U.S. 678, 102 S.Ct. 1349, 71 L.Ed.2d 547 (1982), this court observed:
 
 
 53
 [H]ad the MTA not taken over the operations of the LIRR in 1966, there probably would be no LIRR today. The substantial state and local funds used to subsidize the railroad attest to the fact that no private businessman would dare undertake the venture.
 
 
 54
 Id. at 28.
 
 
 55
 (2)
 
 
 56
 Like the term "political subdivision," the terms "agency" and "instrumentality" are not defined in ERISA, nor are there any regulations under ERISA which interpret these terms. The Internal Revenue Service, however, has had occasion to define "agency or instrumentality" under 26 U.S.C. Sec. 414(d). That section was added to the Internal Revenue Code by Title II of ERISA and defines those "governmental plans" which are exempt from certain qualification requirements for favorable tax treatment. See 26 U.S.C. Secs. 410(c)(1)(A), 411(e)(1)(A), and 412(h)(3). The definition of "governmental plan" in Sec. 414(d) is virtually identical to the definition in 29 U.S.C. Sec. 1002(32).
 
 
 57
 In interpreting the Sec. 414(d) exemption, the IRS has consistently relied on Revenue Ruling 57-128, 1957-1 C.B. 311, which lists six factors to be considered in determining whether a particular entity is an agency or instrumentality:
 
 
 58
 In cases involving the status of an organization as an instrumentality of one of more states or political subdivisions, the following factors are taken into consideration: (1) whether it is used for a governmental purpose and performs a governmental function; (2) whether performance of its function is on behalf of one or more states or political subdivisions; (3) whether there are any private interests involved, or whether the states or political subdivisions involved have the powers and interests of an owner; (4) whether control and supervision of the organization is vested in public authority or authorities; (5) if express or implied statutory or other authority is necessary for the creation and/or use of such an instrumentality, and whether such authority exists; and (6) the degree of financial autonomy and the source of its operating expenses.
 
 
 59
 Because the IRS is one of the agencies charged with administering ERISA, its interpretations of the statute are entitled to great deference. See Hawkins County, 402 U.S. at 605, 91 S.Ct. at 1749; Belland v. Pension Benefit Guaranty Corp., 726 F.2d 839, 843 (D.C.Cir.), cert. denied, 469 U.S. 880, 105 S.Ct. 245, 83 L.Ed.2d 183 (1984). As evidenced by the discussion in the previous section, the LIRR satisfies all six of the IRS criteria: (1) the LIRR serves an "essential governmental function," see N.Y.Pub.Auth.Law Secs. 1264(2), 1266(5); (2) it performs its function on behalf of the State of New York, id.; (3) it is wholly owned by the MTA, a governmental entity, id. Sec. 1266(5); (4) it is controlled by the same public appointees who are members of the MTA, id. Secs. 1263(1)(a), 1266(5); (5) the LIRR performs functions delegated to it by the MTA pursuant to express statutory authority, id. Sec. 1266(5); and (6) the LIRR is heavily dependent on state subsidies to meet its operating expenses.
 
 
 60
 (3)
 
 
 61
 Finally, the reasons for exempting governmental plans from ERISA apply with equal force to the LIRR. The LIRR has been, in effect, a state-owned railroad since 1966 when it was acquired by the MTA. Every year since then, the LIRR has received massive state operating subsidies. LIRR employees, therefore, like other governmental employees, can depend on the state's taxing power to protect their right to retirement income. See H.R.Rep. No. 807, 1974 U.S.Code Cong. & Ad.News at 4756-57. Moreover, in light of the state's past practice of funding the LIRR's operating deficits, any additional costs imposed on the LIRR as a result of complying with ERISA would most likely be borne, at least to some extent, by New York taxpayers. See H.R.Rep. No. 807, 1974 U.S.Code Cong. & Ad.News at 4830.
 
 
 62
 Rose argues that this history of state funding is irrelevant to the question of the LIRR Plan's status, because the state is not legally obligated to fund the LIRR. Rather, Rose asserts, "such subsidy is a policy choice made by the state on a year to year basis, and there is no guarantee that the policy will not be changed in any subsequent year." Rose is correct about the nonobligatory nature of the state funding, but her argument ignores the fact that many governmental services are funded in the same manner.
 
 
 63
 As a practical matter, the State of New York has demonstrated its commitment to sustain the LIRR for the past twenty years, and reinforced its commitment in 1980, when the MTA converted the LIRR into a public benefit corporation. For all the foregoing reasons, we adopt the IRS criteria and conclude that the LIRR is an "agency or instrumentality" of the MTA under 29 U.S.C. Sec. 1002(32).
 
 
 64
 III. The Meaning of "Established or Maintained."
 
 
 65
 On this appeal, Rose raises a new issue of statutory interpretation which we also must address. She asserts that the clause of Sec. 1002(32) which provides that a governmental plan is one "established or maintained" (emphasis added) by a governmental entity, should be read instead as established and maintained. Furthermore, she claims that the LIRR Plan was not both established and maintained by a qualified governmental entity, and therefore should not benefit from the governmental plan exemption.
 
 
 66
 Rose's interpretation of the "established or maintained" language in 29 U.S.C. Sec. 1002(32) derives from the definition of "governmental plan" in Titles II and IV of ERISA. Title II, as discussed earlier, defines governmental plans in the context of an exemption from certain plan qualification requirements. See 26 U.S.C. Sec. 414(d). The Title II definition is identical to the Title I definition except that it uses the phrase "established and maintained." The "established and maintained" language is also used in Title IV of ERISA, see 29 U.S.C. Sec. 1321(b)(2), in which governmental plans are exempted from the plan termination and insurance requirements of that Title. Finally, Rose points out that certain other ERISA definitions use the "established and maintained" language. See, e.g., 29 U.S.C. Sec. 1002(33) ("church plan").
 
 
 67
 Rose concludes that the use of "established or maintained" in 29 U.S.C. Sec. 1002(32) was simply the result of "congressional inadvertence," and that the Title I definition should be read consistently with the other definitions of governmental plan, as "established and maintained." Rose neglects to mention, however, that several other ERISA definitions use the "established or maintained" language. See 29 U.S.C. Sec. 1002(1) (definition of "welfare plan"); id. Sec. 1002(2)(A) (definition of "pension plan"); id. Sec. 1002(16)(B) (definition of "plan sponsor"); and id. Sec. 1002(40)(A) (definition of "multiple employer welfare arrangement").
 
 
 68
 Nothing in the legislative history of ERISA offers a clue as to the significance, if any, of the inconsistent definitions of governmental plan. In the Feinstein case, 477 F.Supp. 1256, the district court took note of the discrepancy but decided to interpret the "established or maintained" language of 29 U.S.C. Sec. 1002(32) according to its literal meaning. Id. at 1260 & n. 6.
 
 
 69
 It is a fundamental principle of statutory construction that the starting point must be the language of the statute itself. American Tobacco Co. v. Patterson, 456 U.S. 63, 68, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982) (quoting Reiter v. Sonotone Corp., 442 U.S. 330, 337, 99 S.Ct. 2326, 2330, 60 L.Ed.2d 931 (1979)). "[A]bsent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." Id. (quoting Consumer Product Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)).
 
 
 70
 On the other hand, "a court should go beyond the literal language of a statute if reliance on that language would defeat the plain purpose of the statute." Bob Jones University v. United States, 461 U.S. 574, 586, 103 S.Ct. 2017, 2025, 76 L.Ed.2d 157 (1983). Cf. Swaida v. IBM Retirement Plan, 570 F.Supp. 482 (S.D.N.Y.1983) (declining to apply literal meaning of "year of service" definition in section 203(b)(2)(A) of ERISA, 29 U.S.C. Sec. 1053(b)(2)(A)), aff'd, 728 F.2d 159 (2d Cir.) (per curiam), cert. denied, 469 U.S. 874, 105 S.Ct. 232, 83 L.Ed.2d 161 (1984). Courts have interpreted "or" as meaning "and," and vice versa, in order to carry out the legislative intent of a statute. See United States v. Moore, 613 F.2d 1029, 1039-40 & nn. 84-86 (D.C.Cir.1979) (collecting cases), cert. denied, 446 U.S. 954, 100 S.Ct. 2922, 64 L.Ed.2d 811 (1980).
 
 
 71
 Rose argues that adopting the literal meaning of "established or maintained" would lead to anomalous results which are inconsistent with the purpose of the governmental exemption. For example, a plan which was originally established by a governmental body but subsequently taken over by a private entity would continue to qualify for the exemption, despite the fact that the now-private plan would no longer be backed by the security of the government's taxing power. We agree with Rose that this result indeed seems to conflict with Congress' goal of "remedy[ing] certain defects in the private retirement system." H.R.Rep. No. 533, 1974 U.S.Code Cong. & Ad.News at 4639. See also 29 U.S.C. Sec. 1001.
 
 
 72
 Unfortunately, the "established and maintained" reading leads to an equally anomalous result. If a plan is required to have been both established and maintained by a governmental entity in order to qualify for exemption, then a plan which was established by a private entity but subsequently taken over by a governmental body would continue to be subject to ERISA. This outcome conflicts with the federalism-based concerns which led Congress to exempt governmental plans in the first place.
 
 
 73
 The fact that both versions of the governmental plan definition lead to seemingly incongruous results makes the discrepancy all the more troubling. The PBGC, which administers Title IV of ERISA, has resolved the dilemma by not construing the "established" requirement strictly where to do so would frustrate congressional intent. Thus the PBGC's position is that "a pension plan maintained by a public agency or political subdivision which has been taken over from a private business is excluded from the provisions of Title IV." PBGC Op. Ltr. 75-44 (December 8, 1975). We find the PBGC's approach to be a sensible one; the status of the entity which currently maintains a particular pension plan bears more relation to Congress' goals in enacting ERISA and its various exemptions, than does the status of the entity which established the plan.
 
 
 74
 In any event, even if we agreed with Rose that the correct interpretation of Sec. 1002(32) was established and maintained, we would still not conclude that the LIRR Plan was covered by ERISA, because the Plan was in fact established and maintained by the LIRR.
 
 
 75
 Rose herself concedes that the Plan is maintained by the LIRR. The Plan is funded by the LIRR and administered by a five-person Board of Managers, the members of which are appointed by the LIRR Board of Directors. The Board of Managers reviews applications for pension benefits. In the case of employees covered by collective bargaining agreements (or their beneficiaries), review of an unfavorable benefits decision may be obtained from the Joint Board on Pension Applications. The Joint Board, in turn, is comprised of three members of the Board of Managers and two Union representatives named by the LIRR Labor Council.
 
 
 76
 Rose contends, however, that the Plan was not established by the LIRR, but by the Pennsylvania Railroad in 1938. When the Pennsylvania Railroad owned the LIRR, it established the "Plan for Supplemental Pensions." In 1971, in fulfillment of its collective bargaining agreements, the LIRR replaced the Plan for Supplemental Pensions with the current "Long Island Rail Road Company Pension Plan" by amending the former plan in its entirety. The LIRR did not "terminate" the Plan for Supplemental Pensions, because termination of a plan triggers the immediate vesting of all accrued benefits and distribution of plan assets. See 26 U.S.C. Sec. 411(d)(3); 26 C.F.R. Sec. 1.401-6; Donovan v. UMIC, Inc., 580 F.Supp. 1455 (S.D.N.Y.1984). According to the IRS regulations, replacement of a plan with a comparable plan does not constitute a "termination." 26 C.F.R. Sec. 1.401-6(b)(1).
 
 
 77
 Rose asserts that the LIRR Plan was not "established" by the LIRR within the meaning of ERISA, because the Plan for Supplemental Pensions was not formally "terminated." Defendants argue that Rose's interpretation is overly restrictive and inconsistent with the legislative purpose behind the governmental plan exemption.
 
 
 78
 Defendant's position is consistent with Feinstein v. Lewis, which held that a benefit plan was "established" by a governmental entity even though it was created pursuant to collective bargaining, rather than by statute or other unilateral government action. In Feinstein, the district court observed that "Congress, in exempting governmental plans, was concerned more with the governmental nature of public employees and public employers than with the details of how a plan was established or maintained." 477 F.Supp. at 1262.
 
 
 79
 We agree with defendants that under the facts of this case, where the LIRR was acquired by a public entity and its former pension plan was amended in its entirety, the LIRR Plan was "established" by the LIRR. A broad reading of the term "established"--whereby a new plan may be established under ERISA without the preexisting one having been formally "terminated"--is more consistent with the legislative intent behind the governmental plan exemption.
 
 CONCLUSION
 
 80
 The LIRR Plan under which Richard Rose was covered at the time of his death was both established and maintained for its employees by the Long Island Railroad Company. The LIRR is an agency or instrumentality of the MTA, which in turn is a political subdivision of the State of New York, within the meaning of 29 U.S.C. Sec. 1002(32). We hold that when Mary Rose applied for benefits in 1976, the LIRR Plan was a governmental plan under 29 U.S.C. Sec. 1003(b)(1) and therefore exempt from compliance with Title I of ERISA. The decision of the district court is hereby affirmed.
 
 
 
 *
 Judge Pierce was designated subsequent to oral argument, pursuant to Second Circuit Rule 0.14, to replace Chief Judge Feinberg, who recused himself
 
 
 [1]
 Following the 1982 remand, neither the United States nor the State of New York sought leave to intervene or to file amicus briefs. Subsequent to the argument of this appeal, however, and pursuant to a request by this court, the United States submitted a new amicus brief and the State of New York submitted a letter, reaffirming their positions that the LIRR Plan was an exempt governmental plan