**STATE OF MICHIGAN and Michigan Education Trust, Plaintiffs–Appellants,**

v.

**UNITED STATES of America, Defendant–Appellee.**

No. 92–2295.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 6, 1993.

Decided Nov. 8, 1994.

by the Michigan Education Trust. The trust is a state agency established to receive advance payments of college tuition, invest the money, and ultimately make disbursements under a program that lets its beneficiaries attend any of the state's public colleges or universities without further tuition cost.

The district court held the education trust liable for federal income taxes. 802 F.Supp. 120. We conclude that while Congress could, if it wished, tax the investment income of state agencies such as the education trust, it has not chosen to do so. Accordingly, we shall reverse the judgment of the district court.

Michael R. Atkins, Lawrence D. Owen (briefed), William J. Danhof, Miller, Canfield, Paddock & Stone, Lansing, MI, John J. Collins, Jr. (argued), Stevan Uzelac, Miller, Canfield, Paddock & Stone, Detroit, MI, Frank J. Kelley, Office of Attorney General, Appellate Div., Lansing, MI, Terrence P. Grady, Asst. Atty. Gen. (briefed), Finance & Development, Lansing, MI, for plaintiffs-appellants.

Gary R. Allen, Acting Chief (briefed), Richard Farber, Francis M. Allegra (argued), U.S. Dept. of Justice, Appellate Section, Tax Div., Washington, DC, Daniel M. LaVille, Office of the U.S. Attorney, Grand Rapids, MI, Donald J. Gavin, U.S. Dept. of Justice, Tax Div., Washington, DC, for defendant-appellee.

Before: GUY and NELSON, Circuit Judges; and HOOD, District Judge.*

NELSON, J., delivered the opinion of the court, in which HOOD, D.J., joined. GUY, J. (pp. 830–37), delivered a separate dissenting opinion.

DAVID A. NELSON, Circuit Judge.

The question presented here is whether the United States Internal Revenue Code imposes a tax on investment income realized

## I

The Michigan Education Trust, created by an act of the Michigan legislature signed into law by the governor on December 23, 1986,[1] is "a public body corporate and politic." M.C.L.A. 390.1425, § 5(1) of the act. As such, the education trust is a public instrumentality of the state. The grant of corporate powers to such an agency makes it "a *quasi* corporation" under Michigan law, see *Advisory Opinion re Constitutionality of PA 1966, No. 346*, 380 Mich. 554, 575, 158 N.W.2d 416, 425 (1968), but the agency "remains an instrumentality of the State." *Id.*

The Michigan Constitution provides, subject to exceptions not relevant here, that each of the "agencies and instrumentalities of the executive branch of state government" must "be allocated by law" to one of the principal departments of the executive branch. Mich. Const., Art. V, § 2. Pursuant to this constitutional requirement, § 5(1) of the Education Trust Act, M.C.L.A. § 390.1425, provides that the education trust "shall be within the department of treasury...."

Like many government agencies vested with corporate powers, the education trust has a board of directors by which such powers are exercised. *Id.* (Among the powers of this particular board is an express statuto-

* The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

1. The Michigan Education Trust Act, P.A.1986, No. 316, Michigan Comp.Laws Ann. § 390.1421 *et seq.*

ry power to "[e]nter into contracts on behalf of the state." M.C.L.A. § 390.1431, § 11(k) of the act.) The state treasurer is a member of the education trust's board *ex officio,* and the other board members (eight in number) are appointed by the governor with the advice and consent of the senate. M.C.L.A. § 390.1430, § 10(1) of the act.

Although the education trust is "within" the treasury department, and although the state treasurer (who is the head of that department) serves as a member of the board, the board acts "independently" of the treasury department. M.C.L.A. § 390.1425, § 5(1) of the act. For certain state constitutional purposes, and for purposes of the law governing payment of full-faith-and-credit obligations of the state, M.C.L.A. § 12.61 *et seq.,* assets of the education trust are not considered state money, common cash, or revenue of the state. M.C.L.A. § 390.1429, § 9(2) of the act. (This technical provision means, among other things, that the education trust has broader investment powers than would otherwise be available to it.)

Trust assets may be invested in any manner the trust deems appropriate, and may be pooled for investment purposes with state pension funds and other investments of the state. M.C.L.A. § 390.1429, § 9(4) of the act. It is state employees who invest education trust assets, and trust funds are paid out only through State of Michigan checks or warrants. All income of the education trust is exempt from state income taxes. M.C.L.A. § 390.1435, § 15 of the act. Michigan's auditor general is responsible for auditing the books of the education trust, and the board must submit an annual accounting to the governor and leaders of the Michigan legislature. M.C.L.A. § 390.1432, § 12 of the act. Legal representation is provided to the education trust by the Attorney General of the State of Michigan.

The business of the education trust's board must be conducted in compliance with Michigan's Open Meetings Act, and the education trust is likewise subject to the state's Freedom of Information Act. M.C.L.A. § 390.1430, §§ 10(5) and 10(6) of the act. All education trust employees are members of the classified civil service of the state; as civil servants, they are subject to state civil service commission rules and regulations. Advance tuition payments collected by the education trust are deposited in a bank trust account under the name of the State Treasurer, State of Michigan, Agent for the Michigan Education Trust. Assets of the trust are earmarked for uses set forth in the statute, including the making of payments to state institutions of higher education on behalf of qualified beneficiaries. M.C.L.A. § 390.1429, § 9(3) of the act.

The Michigan attorney general's department has advised the board of the education trust that the trust is an "agency" of the State of Michigan. The attorney general's department has further advised that the members of the board are "public officers" for purposes of the Michigan Governmental Liability for Negligence Act.

Before we turn to the purposes for which the education trust was created, it will be useful to refer to a bit of early history. On July 13, 1787—two years before the Constitution of the United States was adopted and 50 years before the State of Michigan was admitted to the Union—Congress enacted the Northwest Ordinance. Captioned "An Ordinance for the Government of the Territory of the United States Northwest of the River Ohio," this landmark legislation—which was to have a profoundly important effect on the subsequent development of both state and national law—was the fundamental instrument of government for an area covering more than a quarter of a million square miles. The territory to which the ordinance applied included all of present-day Michigan, plus Indiana, Illinois, Wisconsin, Ohio, and part of Minnesota.

Article III of the Northwest Ordinance began with this famous sentence: "Religion, morality, and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged." The framers of both of Michigan's 20th Century constitutions—the first adopted in 1908 and the second in 1963—included articles on education in which the opening language mirrored the language of the first sentence of Article III of the Northwest Ordinance. Thus Article

VIII, § 1 of Michigan's present constitution, adopted without change from Article IX, § 1 of the constitution of 1908, perpetuates, as part of the state's basic law, the principle that "schools and the means of education shall forever be encouraged."

As part of Michigan's efforts to make "the means of education" available to its citizens, the state maintains an extensive system of public colleges and universities. (The University of Michigan and Michigan State University are but two of a rather long list of such institutions.) Financial support for these public colleges and universities comes from a variety of sources, including both appropriations from the legislature and tuition payments.

During the first half of the decade of the 1980s, tuition costs at Michigan's public institutions of higher education, like tuition costs at public and private colleges throughout the nation, increased at rates that many found alarming. (Over the decade as a whole, the average tuition at Michigan's four-year colleges and universities more than doubled.) In January of 1986, responding to concern about soaring tuition costs, Michigan's governor proposed in his State of the State Address that Michigan adopt a state-run prepaid tuition program "designed to help parents guarantee to their children the opportunity of a Michigan college education." 1986 Mich. Journal of the House 152. The Michigan Education Trust Act was the embodiment of that proposal.

The act contained an extensive set of legislative findings, beginning with one that the attentive reader will find familiar: "It is an essential function of state government to forever encourage schools and the means of education, as provided in section 1 of article VIII of the state constitution of 1963." M.C.L.A. § 390.1422, § 2(a) of the act. The legislature further found it to be "an essential function of state government to encourage attendance at state institutions of higher education," § 2(c); noted that "[s]tudents in elementary and secondary schools tend to achieve to a higher standard of performance when the payment of tuition for their higher education is secured," § 2(h); and declared that "[p]roviding assistance to assure the

higher education of the citizens of this state is necessary and desirable for the public health, safety, and welfare," § 2(i).

In light of these and other findings, the legislature declared the purposes of the act (and of the education trust) to be as follows:

"(a) To encourage education and the means of education.

(b) To maintain state institutions of higher education by helping to provide a stable financial base to these institutions.

(c) To provide wide and affordable access to state institutions of higher education for the residents of this state.

(d) To encourage attendance at state institutions of higher education.

(e) To provide students and their parents economic protection against rising tuition costs.

(f) To provide students and their parents financing assistance for postsecondary education at a Michigan institution of higher education of their choice.

(g) To help provide the benefits of higher education to the people of this state.

(h) To encourage elementary and secondary students in this state to achieve high standards of performance." M.C.L.A. § 390.1423, § 3 of the act.

The manner in which the education trust operates is relatively simple in concept. Acting on behalf of the state and itself (see M.C.L.A. § 390.1426, § 6(1) of the act), the trust enters into advance tuition payment contracts with parents, grandparents, or anyone else who wants assurance that tuition costs for a particular beneficiary will be covered when the time comes for the beneficiary to enter college. The purchaser pays the trust a stipulated sum—determined on the basis of various actuarial assumptions and forecasts—that reflects the number of years for which tuition is to be prepaid and the number of years remaining before the beneficiary (who must be a Michigan resident at the time of the contract) is expected to enter college.

The trust invests all of the funds so collected. If the beneficiary ultimately enrolls as a Michigan resident in a Michigan public col-

lege or university—and the contract does not guarantee that the beneficiary will be admitted, of course, although we are told that by January of 1993 more than 85 percent of the education trust beneficiaries who had graduated from high school had been admitted to a state college or university—the trust is obligated to use the funds it controls to pay the beneficiary's full tuition cost, whatever that cost turns out to be. If the beneficiary is no longer a Michigan resident, he is responsible for the difference between the in-state rate and the out-of-state rate.

If the beneficiary reaches the age of 18 and certifies that he will attend a private college within the state, or will attend a college outside the state, or has decided not to attend college at all, the trust is obligated to pay a refund (which, at the beneficiary's option, may go directly to a designated college or university) in an amount determined under a contractual formula covering that particular contingency. The refund formulas are designed to encourage attendance at some college, as opposed to not enrolling anywhere, but the trust does not promise to cover full tuition costs at any institution other than a public college or university in Michigan.

## II

In 1988, before any advance tuition payment contracts had been entered into, the Treasurer of the State of Michigan requested a "no action" letter from the Securities and Exchange Commission.[2] The state treasurer's letter to the SEC submitted that the education trust was a "public instrumentality" the contracts of which, if deemed to be securities, would be exempt from registration under the Securities Act of 1933 pursuant to § 3(a)(2) of that act, 15 U.S.C. § 77c(a)(2). The SEC responded favorably, the agency's corporate finance division stating that it

would not recommend any enforcement action.

The state was also required to request a ruling from the Internal Revenue Service, pursuant to the following provision in the Education Trust Act: "An advance tuition payment contract shall not be entered into by the trust until the internal revenue service has issued a favorable ruling or opinion that the purchaser of the advance payment contract will not be considered actually or constructively to be in receipt of income." M.C.L.A. § 390.1433, § 13(3) of the act. Joined by a prospective participant in the advance tuition payment program, the Treasurer of the State of Michigan requested such a ruling by letter dated February 19, 1987. The letter also asked for a ruling that "[t]he accrued investment income of the Trust is exempt from federal income taxation pursuant to either the Doctrine of Intergovernmental Tax Immunity or the provisions of Section 115(1) of the Code [26 U.S.C. § 115(1) ]."[3]

In Private Letter Ruling 88–25–027, dated March 29, 1988, the IRS responded with good news and bad news. The good news was that no income would be realized by the purchaser or the beneficiary when an advance tuition payment contract was executed—although income would be realized later on if the value of any subsequently-received educational services or refund exceeded the amount initially paid. The bad news, from the state's standpoint, was that the trust's investment income would be subject to federal income tax.

Following receipt of this ruling, the education trust applied to the IRS for recognition of exemption from taxation under § 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3). (That section exempts corporations and foundations organized and operated exclusively for charitable, educational, or other designated purposes, pro-

2. M.C.L.A. § 390.1433, § 13(4) of the act, provides as follows:
   "Before entering into advance tuition payment contracts with purchasers, the state shall solicit answers to appropriate ruling requests from the securities and exchange commission regarding the application of federal security laws to the trust. No contract shall be entered

without the authority [sic] making known the status of the request."

3. Section 115(1) provides that "[g]ross income does not include ... income derived from any public utility or the exercise of any essential governmental function and accruing to a State or any political subdivision thereof...."

vided that no part of the organization's net earnings inures to the benefit of any private shareholder or individual.) By letter dated April 26, 1989, the IRS replied that it had concluded that the education trust did not qualify for exemption under § 501(c)(3). A final adverse ruling on the education trust's application for tax exempt status under this section was issued on August 8, 1989.

The education trust paid a federal income tax of $4,495 on investment income realized in the fiscal year ending September 30, 1988. A claim for refund followed. More than six months elapsed without a response (see 26 U.S.C. § 6532(a)(1), which gives the IRS up to six months to render a decision on such a claim), and in May of 1990 the education trust, joined by the State of Michigan, commenced the present refund action in the United States District Court for the Western District of Michigan. The parties subsequently stipulated that the trust reported a tax of $7,057,565 on income for the fiscal year ending September 30, 1989, and a tax of $8,768,644 on income for the fiscal year ending September 30, 1990.

Ruling on cross-motions for summary judgment, the district court held the education trust liable for the taxes. The plaintiffs had argued that the Internal Revenue Code was not intended to apply to states or their instrumentalities, but the district court rejected this argument on the theory that the education trust is not an integral part of the State of Michigan. Section 115 was held inapplicable on either or both of two theories: the education trust is not a state or a political subdivision thereof, and the income of the trust does not "accrue" to the state in a bookkeeping sense. With regard to § 501(c)(3) and § 501(c)(4),[4] the court held that "because the Trust's sole direct benefit inures only to individuals who purchase contracts," the service provided by the education trust "constitutes a substantial private purpose that destroys the Trust's exemption." The court also rejected contentions that the education trust was exempt from taxation under the intergovernmental tax immunity

doctrine, the Tenth Amendment to the Constitution, and the provision in Article IV, § 4 of the Constitution requiring the United States to guarantee every state "a Republican Form of Government...." An order granting summary judgment in favor of the United States was entered on August 3, 1992, and the plaintiffs subsequently filed a timely notice of appeal.

### III

The state and the education trust have now abandoned the argument that the federal government lacks constitutional authority to impose a tax on investment income produced in the operation of state programs such as that conducted by the education trust. This was an appropriate move, we believe. The broad constitutional immunity from federal taxation once thought to be enjoyed by states and their instrumentalities has been severely eroded with the passage of time, and several years ago the Supreme Court suggested that it is now an open question whether there is "any" extent "to which States are currently immune from direct non-discriminatory federal taxation." *South Carolina v. Baker*, 485 U.S. 505, 518 n. 11, 108 S.Ct. 1355, 1364, 99 L.Ed.2d 592 (1988).

It used to be thought that public instrumentalities of a state were constitutionally immune from taxation insofar as they performed a "governmental function," as opposed to performing a proprietary or "business" function. See, *e.g.*, *Allen v. Regents of the University System of Georgia*, 304 U.S. 439, 58 S.Ct. 980, 82 L.Ed. 1448 (1938) (federal excise tax could be imposed on sales of tickets to University of Georgia football games, the state having embarked on a business that would normally be taxable); *South Carolina v. United States*, 199 U.S. 437, 26 S.Ct. 110, 50 L.Ed. 261 (1905) (United States could impose license taxes on state-run liquor business). But the constitutionally-based governmental function/proprietary function test produced "uncertainty and instability" that finally led the Supreme Court to abandon it in *State of New York v. United States*,

---

4. The latter section, which had not been the subject of a request for an IRS ruling, exempts "organizations not organized for profit but oper-

ated exclusively for the promotion of social welfare...."

326 U.S. 572, 66 S.Ct. 310, 90 L.Ed. 326 (1946). Although there was no majority opinion in *State of New York,* the Court was unanimous in concluding that the test must be abandoned. See *Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 542, 105 S.Ct. 1005, 1013, 83 L.Ed.2d 1016 (1985), which so states. Accordingly, we are confident that today's Supreme Court would say that Congress is free to impose a non-discriminatory tax on the investment income at issue here if it wants to. The question we must decide is whether Congress has done so.

Section 11(a) of the Internal Revenue Code, 26 U.S.C. § 11(a), provides that "[a] tax is hereby imposed for each taxable year on the taxable income of every corporation." The education trust is only a *"quasi* corporation" under Michigan law, but the reference in § 11(a) to "every corporation" appears, on its face, to be very broad indeed. If one were to read § 11(a) in a vacuum, one might well conclude that the tax imposed by this section extends to the income of all government corporations, *"quasi"* or otherwise, including the income of all cities and towns organized as bodies corporate; the income of all public universities such as the University of Michigan and Michigan State University (bodies corporate under Article 8, § 5 of the Michigan constitution); and the income of such federal instrumentalities as the Commodity Credit Corporation, the Export–Import Bank of the United States, the Pension Benefit Guaranty Corporation, the St. Lawrence Seaway Development Corporation, and the Tennessee Valley Authority. (As to the latter group, see 31 U.S.C. § 9101(3), which lists these and various other federal agencies as "wholly owned Government corporation[s].")

The United States does not contend, of course, that § 11(a) should be read in a vacuum. As a matter of history, the appellee's brief acknowledges, this section has never been interpreted as imposing a tax on income earned directly by a state, a political subdivision of a state, or "an integral part of a State." See, in this connection, Internal Revenue Bureau General Counsel Memorandum 14,407, XIV–1 Cum.Bull. 103 (1935), where the Internal Revenue Bureau concluded almost 60 years ago that a state or political subdivision is not a "corporation" for purposes of the Internal Revenue Code.[5] See also Rev.Rul. 71–131, 1971–1 Cum.Bull. 28 (superseding GCM 14,407, and reaffirming that income derived from the operation of liquor stores by the State of Montana is not subject to federal income tax); Rev.Rul. 71–132, 1971–1 Cum.Bull. 29 (holding that income derived from the operation of liquor stores by the Oregon Liquor Control Commission is not subject to federal income tax); and Rev.Rul. 87–2, 1987–1 Cum.Bull. 18 (holding that a Lawyer Trust Account Fund created by a state supreme court as a vehicle for channeling to "public purposes" income earned on client funds held by attorneys in a fiduciary capacity "is not subject to federal income tax since the Fund is an integral part of the state").

Each of these rulings was based on an understanding—doubtless an informed understanding—of the intent of Congress. The rulings are consistent with a principle of statutory construction that was suggested by Justice Rutledge when the United States Supreme Court abandoned the constitutionally-based governmental function/proprietary function test in 1946. Justice Rutledge urged that the Court apply a rule of construction "requir[ing] that before a federal tax can be applied to activities carried on directly by the States [as opposed, presumably, to activities carried on by the states through private instrumentalities], the intention of Congress to tax them should be stated expressly and not drawn merely from general wording of the statute applicable ordinarily to private sources of revenue." *State of New York v. United States,* 326 U.S. at 585, 66 S.Ct. at 315–16 (Rutledge, J., concurring).

---

**5.** Professor Ellen P. April, in an article entitled "Excluding the Income of State and Local Governments: The Need for Congressional Action," 26 Ga.L.Rev. 421 (1992), points out that while GCM 14,407 classified municipalities as "political subdivisions," municipalities are often organized as corporations. Professor April reads GCM 14,407 as implying, without so stating explicitly, "that status as a political subdivision takes precedence over corporate status." *Id.* at 434.

Justice Rutledge went on to say that "I should expect that Congress would say so explicitly, were its purpose actually to include state functions, where the legal incidence of the tax falls upon the state." *Id.*

A rule of construction comparable to that urged by Justice Rutledge in the tax context has more recently been applied by the Supreme Court in a variety of non-tax situations. See, for example, *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 242, 105 S.Ct. 3142, 3147, 87 L.Ed.2d 171 (1985), where, in holding that the Rehabilitation Act of 1973 did not represent a Congressional abrogation of the immunity from suit enjoyed by states under the Eleventh Amendment, the Court declared that Congress must express any such intent "unequivocally." See also *Will v. Michigan Dept. of State Police,* 491 U.S. 58, 65, 109 S.Ct. 2304, 2309, 105 L.Ed.2d 45 (1989) ("The language of [42 U.S.C.] § 1983 ... falls far short of satisfying the ordinary rule of statutory construction that if Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakenly clear in the language of the statute'" (quoting *Atascadero,* 473 U.S. at 242, 105 S.Ct. at 3147)); *Gregory v. Ashcroft,* 501 U.S. 452, 461, 111 S.Ct. 2395, 2401, 115 L.Ed.2d 410 (1991) (citing *Will's* "plain statement rule" in holding that the federal Age Discrimination in Employment Act does not apply to state judges).

Section 511(a) of the Internal Revenue Code, 26 U.S.C. § 511(a), furnishes an interesting example of a "plain statement" on the taxability of a certain type of income realized by public colleges and universities. Private colleges and other eleemosynary institutions have long been taxed on their "unrelated business taxable income." Section 511(a)(2)(B) now makes it very clear that the tax on such unrelated business income applies in the case of state colleges and universities as well. The tax applies, this section says,

"in the case of any college or university which is an agency or instrumentality of any government or any political subdivision thereof, or which is owned or operated by a government or any political subdivision thereof, or by any agency or instrumentality of one or more governments or political subdivisions. Such tax shall also apply in the case of any corporation wholly owned by one or more such colleges or universities."

■ Congress has never adopted a "plain statement" such as this with regard to the investment income, as opposed to the unrelated business income, of state colleges and universities or other public instrumentalities of the state. If Congress wants to tax the investment income of public bodies, it knows how to make the kind of "plain statement" necessary to impose such a tax.

The United States does not deny that the "plain statement rule" applies in the tax field. It argues, however, that the "rule obviously does not apply where, as here, the activities are carried on by an entity that is not a political subdivision of a state or otherwise an integral part thereof." This argument turns, of course, on the proposition that the education trust is not a political subdivision or otherwise an integral part of the State of Michigan. We are not persuaded, on the record before us, that this proposition is correct.

For guidance in determining whether an entity is part of a state for federal tax purposes, we look first to a pair of Second Circuit decisions involving § 103 of the Internal Revenue Code, 26 U.S.C. § 103. Subject to exceptions not relevant here, that section excludes from taxable income the interest on "any State or local bond," such a bond being defined as "an obligation of a State or political subdivision thereof." In *Commissioner v. Shamberg's Estate,* 144 F.2d 998 (2d Cir. 1944), *cert. denied,* 323 U.S. 792, 65 S.Ct. 433, 89 L.Ed. 631 (1945), and *Commissioner v. White's Estate,* 144 F.2d 1019 (2d Cir.1944), *cert. denied,* 323 U.S. 792, 65 S.Ct. 433, 89 L.Ed. 632 (1945), the Second Circuit addressed the question whether the Port of New York Authority and the Triborough Bridge Authority were "political subdivisions" for § 103 purposes. The court's answer, delivered in opinions written by Judge Augustus Hand, was "yes."

The pertinent treasury department regulations, as quoted in *Shamberg*, 144 F.2d at 999–1000, said that "[t]he term 'political subdivision' ... denotes any division of the State or territory which is a municipal corporation, or to which has been delegated the right to exercise part of the sovereign powers of the State or Territory." The Port of New York Authority—"a body politic and corporate" through which the states of New York and New Jersey built and operated the George Washington Bridge, the Holland and Lincoln Tunnels, and other projects "operated in the interest of the public without profit to private persons," *id.* at 1000—was held to fit this definition notwithstanding that the authority lacked the power to impose taxes, had no power to pledge the credit of either state, and was not subject to the debt limiting provisions of the state constitutions.[6]

Judge Hand found support for this holding in the test laid down in an opinion given by Attorney General McReynolds soon after § 103 was first adopted:

"The term 'political subdivision' is broad and comprehensive and denotes any division of the State made by the proper authorities thereof, acting within their constitutional powers, for the purpose of carrying out a portion of those functions of the State which by long usage and inherent necessities of government have always been regarded as public." 30 Op.Atty.Gen. 252 (1914), as quoted at 144 F.2d at 1004.

"[T]he real criterion adopted by the Attorney General," Judge Hand observed, "seems to have been whether the activities of the subdivision were for a public purpose." *Shamberg*, 144 F.2d at 1004.

Applying this criterion to the facts before us, we think it obvious that encouraging higher education by helping provide the means for attendance at Michigan's public colleges and universities—the basic function for which the education trust was established by the Michigan legislature—is at least as much a "public function" as building and operating bridges and tunnels. See *Brown v. Bd. of Education*, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954), where the Supreme Court said that "education is perhaps the most important function of state and local governments." The contractual obligations of the Michigan Education Trust are no less the obligations of a "political subdivision," in our view, than the obligations of the Port of New York Authority or the Triborough Bridge Authority.

As we have seen, the treasury regulations quoted by Judge Hand in *Shamberg* defined a "political subdivision" as any division of the state which was *either* a municipal corporation *or* to which the right to exercise a part of the state's sovereign power had been delegated. The latter part of the definition made the court's position "still clearer," Judge Hand wrote, because the Port of New York Authority was a subdivision "to which has been delegated the right to exercise part of the sovereign power of the State...." *Id.* at 1005. The Triborough Bridge Authority was likewise "a subdivision of state government empowered to exercise governmental functions on behalf of the City of New York...." *White*, 144 F.2d at 1020.

In the case at bar, similarly, the education trust is a public agency explicitly authorized to exercise contracting powers "on behalf of the state" for a purpose that the Michigan legislature has declared "is necessary and desirable for the public health, safety, and welfare." The education trust has thus been empowered to exercise governmental functions on behalf of the State of Michigan, it seems to us, just as Judge Hand said the Triborough Bridge Authority had been empowered to do on behalf of the City of New York. And the education trust would qualify as a "political subdivision" under the regulations in any event, we believe, since, as "a

---

**6.** The port authority did, however, maintain a uniformed police force, the members of which were designated by statute as regular police and peace officers. *Id.* at 1003. The authority could make and enforce rules and regulations relating to its various bridges and tunnels, and penalties—enforceable in court—were provided for violation of such rules and regulations. *Id.* at 1002. The authority also had the power of condemnation. *Id.* at 1003. In the instant case the appellants contend that the education trust also has the power of condemnation, see M.C.L.A. § 213.23, but the United States suggests—correctly, in all probability—that the power is not one the education trust is likely to wish to use or be able to use.

public body corporate and politic," it is in a broad sense a "municipal corporation."

The same cannot be said of Temple University, a state-related entity which the Third Circuit has held not to be a "political subdivision" for § 103 purposes. See *Philadelphia National Bank v. United States*, 666 F.2d 834 (3d Cir.1981), *cert. denied*, 457 U.S. 1105, 102 S.Ct. 2904, 73 L.Ed.2d 1314 (1982). Temple was founded in the 19th Century as a private educational institution, and it was reorganized under a 1965 Pennsylvania statute that gave slightly under 40 percent of the seats on the institution's board of trustees to designated public officials and appointees of the governor and leaders of the legislature. At the time of the reorganization, the university started receiving greater financial support from the Commonwealth than it had in the past. The legislature was empowered to set tuition schedules if it chose to make adequate appropriations, but the board of trustees continued to be responsible for the university's affairs otherwise. The Supreme Court of Pennsylvania held that the school was not a state "agency," and the United States successfully argued before the Third Circuit that "Temple is a private, non-profit corporation, governed by a privately controlled Board of Trustees, and has not been delegated sovereign power." *Id.* at 837.

In holding that the university was not a political subdivision, the Third Circuit distinguished *Shamberg* and *White* on a number of grounds, some of which represent points on which the port and bridge authorities described in those cases differ from the education trust with which we are concerned here. The fact remains, however, that the education trust is a purely public body, like the bridge and port authorities, while Temple University is not. The *Philadelphia National Bank* decision fails to persuade us that the education trust is not a political subdivision.

The Third Circuit's decision in *Philadelphia National Bank* is to be contrasted with that of the Second Circuit in *Rose v. Long Island Railroad Pension Plan*, 828 F.2d 910 (2d Cir.1987), *cert. denied*, 485 U.S. 936, 108 S.Ct. 1112, 99 L.Ed.2d 273 (1988), an ERISA case where the court relied heavily on income tax precedents. At issue in *Rose* was the status of a railroad company that had once been privately owned, but that had been acquired by New York State's Metropolitan Transportation Authority. (The transportation authority ultimately converted the railroad into a public benefit corporation under New York law.) The Second Circuit had to decide whether the railroad was a "political subdivision [of the state or an] agency or instrumentality of [the state or a political subdivision thereof]" within the meaning of 29 U.S.C. § 1002(32). The court answered this question in the affirmative, and held that the railroad's pension plan was exempt from compliance with Title I of ERISA as a "*governmental* plan." (Emphasis supplied.)

The statutory language on which *Rose* turned is identical to that contained in § 414(d) of the Internal Revenue Code, 26 U.S.C. § 414(d):

"[T]he term 'governmental plan' means a plan established and maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing."

Whether a particular entity is an agency or instrumentality of a state or political subdivision for purposes of § 414(d), as the *Rose* court observed at 828 F.2d at 918, has long been determined by the Internal Revenue Service under Rev.Rul. 57–128, 1957–1 Cum. Bull. 311. This revenue ruling lists six factors to be considered:

"In cases involving the status of an organization as an instrumentality of one or more states or political subdivisions, the following factors are taken into consideration: (1) whether it is used for a governmental purpose and performs a governmental function; (2) whether performance of its function is on behalf of one or more states or political subdivisions; (3) whether there are any private interests involved, or whether the states or political subdivisions involved have the powers and interests of an owner; (4) whether control and supervision of the organization is vested in public authority or authorities; (5) if express or implied statutory or other authority is necessary for the creation and/or use of such

an instrumentality, and whether such authority exists; and (6) the degree of financial autonomy and the source of its operating expenses."

The *Rose* court found that the state-owned railroad satisfied all six of the IRS criteria. See 828 F.2d at 918.

The reasoning employed by the Second Circuit in *Rose* suggests that the Michigan Education Trust satisfies at least five of the criteria. (1) Like the state-owned railroad, the education trust is used for what the state legislature has determined to be a "governmental purpose." (2) Like the railroad, the education trust performs this function on behalf of the state. (3) Like the railroad, the education trust is solely a governmental entity; no private ownership interests are involved. (4) Like the railroad, the education trust is controlled by public appointees. (5) The functions performed by the railroad were delegated to it by the Metropolitan Transportation Authority, while the functions performed by the education trust are carried out pursuant to direct statutory authorization. The education trust would not even exist, of course, but for the enactment of the statute creating it.

With regard to the sixth criterion, financial autonomy, the appellant in *Rose* stressed the fact that although the railroad had received large operating subsidies from the state ever since the takeover, the state was not legally obligated to fund the railroad. The court acknowledged that this was true, but observed that "[the appellant's] argument ignores the fact that many governmental services are funded in the same manner." *Id.*

Whether Michigan's education trust will ultimately be able to continue operating without significant appropriations from the legislature remains to be seen. Michigan obviously hopes that such appropriations will never be necessary—and as in the case of the publicly-owned railroad and many similar governmental instrumentalities, there is no legal requirement that any operating deficits be covered by appropriations from the general funds of the state. If the education trust should ever find itself unable to fulfill the contractual commitments made by it on behalf of the state, however, there would un-

doubtedly be enormous pressure on the legislature to supply the necessary funds. This may not be enough to satisfy the sixth criterion, but viewing the six factors as a whole it seems to us that on balance they militate in favor of a conclusion comparable to that reached by the Second Circuit in *Rose.*

The short answer to all of this, the United States suggests, is to be found in the last two sentences of footnote 2 in *United States v. Maryland Savings–Share Insurance Corporation,* 400 U.S. 4, 7, 91 S.Ct. 16, 18, 27 L.Ed.2d 4 (1970) (per curiam). There the Supreme Court endorsed a lower court's conclusion that a nonprofit mutual insurance corporation chartered to insure savings and loan accounts was not exempt from federal taxation as a state instrumentality. The *Maryland Savings–Share* case involved a private corporation, however, as we shall see, and not a public body; accordingly, we do not consider the case controlling here.

The Maryland Savings–Share Insurance Corporation was chartered in 1962 for the purpose of insuring the accounts of depositors in private savings and loan associations that were members of the corporation. Although not chartered under the state's general corporation law, the corporation possessed all the powers conferred on corporations by that law. Art. 23, § 161MM, Ann. Code of Md. The corporation was not given any power to make contracts on behalf of the state. The first annual meeting of the corporation could not be held until a minimum of twenty-five savings and loan associations had become corporation members, and at that meeting the savings and loan associations were to elect eight of the eleven members of the corporation's board of directors. Art. 23, § 161OO, Ann.Code of Md. The governor of the state was to appoint the remaining three members of the board. *Id.* Public appointees thus held less than 30 percent of the seats on the insurance company's board, an even smaller percentage of public appointees than Temple University had. (See *Philadelphia National Bank v. United States,* 666 F.2d at 836, explaining that Temple's board of trustees had fifteen public members and twenty-four private members.)

There was a time when all nonprofit mutual companies organized to insure accounts in member savings and loan associations were statutorily exempt from federal income taxes, but the law was eventually changed to exempt such companies only if they had been organized before September 1, 1957. 26 U.S.C. § 501(c)(14)(B). Maryland Savings–Share Insurance Corporation subsequently brought a tax refund action in which it challenged the cutoff date as a denial of due process; § 501(c)(14)(B) was arbitrary and unconstitutional, the corporation contended, because the section "exempt[ed] essentially identical corporations from taxation...." *Maryland Savings–Share Insurance Corporation v. United States*, 308 F.Supp. 761, 764 (D.Md.1970). The corporation also contended that its income was exempt from taxation under 26 U.S.C. § 115(a)(1) and under the intergovernmental tax immunity doctrine. *Id.*

The district court rejected the latter contentions, concluding among other things that the tax on the corporation imposed no burden on the State of Maryland. The district court accepted the argument that the cutoff date was arbitrary and unconstitutional, however, and a refund of taxes was granted on that basis. *Id.* at 768–72. On direct appeal, the United States Supreme Court reversed the judgment of the district court.

The Supreme Court's relatively short per curiam opinion was devoted almost entirely to the due process question. It is significant for our purposes, however, that in its statement of the facts relevant to the due process issue the Supreme Court expressly recognized that the pre–1957 insurance companies with which Maryland Savings–Share was comparing itself were "private insurers." *United States v. Maryland Savings–Share Insurance Corporation*, 400 U.S. at 5, 91 S.Ct. at 17. We infer that the Court viewed Maryland Savings–Share as a private insurer too, and this inference is strengthened by the two sentences of footnote 2 in which the Court disposed of the public instrumentality issue:

"We also find unpersuasive MSSIC's remaining argument that it is an instrumentality of the State and hence entitled to exemption from federal taxation under the doctrine of intergovernmental immunity and under § 115(a)(1) of the Code, 26 U.S.C. § 115(a)(1). The District Court properly rejected this argument." *Id.* at 7 n. 2, 91 S.Ct. at 17 n. 2.

The fact that a private insurer such as Maryland Savings–Share Insurance Corporation is not entitled to tax exemption as a public instrumentality hardly means that a public body such as the Michigan Education Trust is not entitled to exemption. Unlike the insurance corporation, the education trust is clearly a public instrumentality. Unlike the insurance corporation, the education trust has a board appointed entirely by the governor of the state. And unlike the insurance corporation, the education trust makes its contracts on behalf of the state—as the Michigan legislature expressly provided in the governing statute not once, but twice. See M.C.L.A. § 390.1426 and M.C.L.A. § 390.1431.

The education trust is not an integral part of the State of Michigan, the United States argues, both because the trust's corporate form of organization makes it "functionally independent" of the state and because the source and earmarking of its funds make it "fiscally independent." Neither branch of the argument is persuasive.

▌ It is "immaterial," to borrow an adjective used by Judge Hand in *White's Estate*, 144 F.2d at 1021, that the Michigan legislature decided to create a public *quasi* corporation to receive and invest advance tuition payments instead of assigning this function to a traditional executive department not organized in corporate or *quasi* corporate form. The point can be illustrated, perhaps, with an example from the federal level. This country's postal service used to be operated by a traditional executive department; since the early 1970s, however, it has been operated by an "independent establishment," the United States Postal Service, organized along the lines of a government corporation. See 39 U.S.C. §§ 201 *et seq.* No one would ever have imagined that the income of the old Post Office Department was subject to taxation by either the United States or by individual states—and to sup-

pose that the income of the new Postal Service is now subject to taxation merely because the Postal Service is "functionally independent" would be absurd. The Postal Service is as much an integral part of the United States as the Post Office Department was.

■ It is likewise immaterial that the funds of the education trust, like the funds of many public corporations, authorities, and similar establishments, come primarily from persons to whom the entity provides a service—and it is immaterial that such funds are earmarked for the benefit of those who receive the service. If the funds of the Postal Service come primarily from persons who buy stamps, the funds of the Tennessee Valley Authority from those who purchase power from that agency, and the funds of the Port of New York Authority from users of the authority's bridges and tunnels, it does not mean that the Postal Service, the Tennessee Valley Authority, and the Port of New York Authority are anything other than governmental in character. Neither is the governmental character of these agencies compromised in any way by the fact that the agencies' funds are earmarked—like highway trust funds and countless other restricted accounts of governmental bodies—for use in performing the functions that the agencies were created by law to perform.

It is true that the particular individuals who attend public colleges and universities in Michigan under the state's prepaid tuition program benefit directly from the program, while the rest of the citizenry benefits only indirectly. But much the same thing can be said of most government benefit programs, including the state student loan programs through which many students "post-pay" their tuition. Suppose the State of Michigan

were to create a public *quasi* corporation to manage a revolving student loan fund for disadvantaged youths. If the investment income of such a body would not be held subject to taxation under existing law—and we are confident that it would not be, regardless of the body's "functional independence" and regardless of the earmarking of its assets—it is hard to see how the investment income of the education trust could be considered taxable.

Or suppose that the State of Michigan created a public *quasi* corporation to hold and invest state employees' pension funds. The only direct beneficiaries would be the employees themselves, and the agency, by hypothesis, would be functionally and fiscally independent of the general government. The notion that the pension agency would be treated as anything other than an integral part of the state strikes us as untenable—and the notion that the Michigan Education Trust is not an integral part of the State of Michigan is equally untenable, in our opinion. The education trust *is* an integral part of the state, and its investment income is not currently subject to taxation under § 11(a) of the Internal Revenue Code.

The foregoing analysis makes it unnecessary for us to reach the remaining issues raised on appeal, including the question whether the "very old and somewhat cryptic language" of 26 U.S.C. § 115 creates an exclusion for the education trust's income [7] and the question whether the trust is a charitable, educational, or social welfare organization exempt from taxation by reason of 26 U.S.C. §§ 501(c)(3) or 501(c)(4).

The judgment of the district court is **REVERSED,** and the case is **REMANDED** with instructions to grant the refund.

---

7. The characterization of § 115 comes from Lehman, "Social Irresponsibility, Actuarial Assumptions, and Wealth Distribution: Lessons about Public Policy from a Prepaid Tuition Program," 88 Mich.L.Rev. 1035, 1085 (1990). Professor Lehman does not believe that the education trust should be treated as part of the state for tax purposes, nor does he believe that § 115 applies here. *Id.* Not surprisingly, perhaps, academic views on these matters are far from uniform. See Aprill, "Excluding the Income of State and Local Governments: The Need for Congressional Action," 26 Ga.L.Rev. 421, 496 (1992) (suggest-

ing that "the IRS decisions regarding prepaid tuition plans are particularly vulnerable to court challenge" in light of *Gregory v. Ashcroft,* 501 U.S. 452, 111 S.Ct. 2395); Phillips, "Federal Taxation of Prepaid College Tuition Plans," 47 Wash. & Lee L.Rev. 291, 301, 322–27 (1990) (suggesting that the IRS ruling on the income tax treatment of the Michigan Education Trust was "surprising," explaining why there is a plausible argument that the trust "is not subject to income tax, because it is an integral part of the state," and marshalling arguments as to why § 115 would apply in any event).

RALPH B. GUY, Jr., Circuit Judge, dissenting.

I respectfully dissent. In doing so, I hasten to add that this is a difficult case, and principled arguments can be marshalled on either side of this issue. The court starts out by stating that "while Congress could, if it wished, tax the investment income of state agencies such as the education trust, it has not chosen to do so." My view is to the contrary. I believe that although Congress could exempt such income from taxation, it has not done so. I find some support for this position in the introduction of legislation in Congress in 1988 by U.S. Senator Donald Riegle of Michigan, at the request of state officials, to exempt MET from federal income taxation.[1] Although I recognize that legislation can be introduced to resolve uncertainty as well as to create a new exemption, it is significant that this effort to provide a legislative exemption came on the heels of MET finding itself very quickly in financial difficulty after it initially began voluntarily paying the tax.

I also would place more of a political overlay on the analysis of these issues than does the court. However well intentioned it may sound to put into place a program guaranteeing parents affordable college tuition in the future for their children, the engine driving this program was in no small degree plain old partisan politics. Fifty-five thousand persons signed up for this program, and I assume that most of them were registered voters.[2]

At this point one might ask, so what? What does all of this have to do with whether or not the money earned on MET investments is taxable? The answer to this question is somewhat complex.

Parents who signed a contract with MET essentially were buying an annuity. They would put "X" dollars up front, and over time the interest earned on their investment would allow the fund to grow and keep pace with projected increases in college tuition. If it was this simple, why didn't parents just buy an annuity on the open market to accomplish the same result? The answer is that no private company could offer an annuity at the attractive price at which it was being offered by MET. MET was able to undercut the market for two reasons. First, in my view, MET proceeded imprudently on the assumption that its earnings would continue at the abnormally high rate that State investments had been earning. Second, unlike a private

---

1. The proposed amendment read in part:

> (b) Qualified State Prepaid Tuition Plans.—
> (1) For purposes of subsection (a)(1), program income derived by a state or agency or instrumentality or political subdivision thereof or an entity created and administered by a state for the benefit of its residents, in connection with a program the function of which is to provide access to higher education by issuing contracts for the provision of education services or the payment of higher education expenses with respect to which an individual is entitled to an exclusion from gross income pursuant to section 135(d), shall be treated as income derived from the exercise of an essential governmental function.

134 Cong.Rec. S 15492 (1988).

2. The New York Times has characterized programs such as this as the "key" to middle-class voters:

> Now with programs to help two-earner families find day care, to expand student loans and to help young families buy houses, the Democrats hope to restore their own standing, and in the process re-establish government in the good graces of the middle class.

> This approach, in fact, has become quite popular at the state level. One of the bolder experiments is Gov. James J. Blanchard's Michigan Education Trust. Under the plan, the state's parents can deposit relatively modest sums today in a state-run interest-bearing trust in exchange for guaranteed tuition for their child in Michigan's college and university system. For an infant, the cost of a four-year guarantee is $6,756. It's more for older children, because the money would be on deposit for a shorter period.

> Critics of the plan say it is a politician's dream. An article in The New Republic recently called it a scheme through which politicians "can buy today's votes with money from tomorrow's (as well as today's) taxpayers," since the promise of a college education will presumably be redeemed long after Mr. Blanchard, who would like to play a larger role in national party strategy, leaves office. But Mr. Blanchard insists that the plan is financially sound. In any case, it has proved immensely popular, and the state is now moving to establish a similar program to help first-time home buyers.

E.J. Dionne Jr., *Democrats Seek the Key to the Middle Class*, N.Y.Times, Apr. 30, 1989, § 4 at 5.

company, MET had the luxury of underestimating the rate of future tuition increases.[3]

Now I realize that for a government official to overstate revenues and understate expenses is not a capital offense. If it were, death row would be even more crowded than it is. But for MET there were more immediate consequences than the possibility of an eventual deficit. MET was forced to deal almost immediately with a shortfall, and in 1990, only two years after its launch, MET stopped accepting applications and has never resumed.

Although the shortfall was primarily the result of less return on investment than anticipated and greater increases in tuition than contemplated, nothing could be done about these two factors. The only adjustment that hopefully could be made was to secure tax-exempt status, notwithstanding that MET had been told from the start by the IRS that it would not qualify for tax-exempt status,[4] a ruling MET accepted.[5] MET was forced by financial pressure to revisit this issue, however, and instituted this lawsuit.[6] The district judge granted summary judgment in favor of the United States. For the reasons that follow, I am convinced that Judge Hillman was correct.

## I.

With one limited exception,[7] Congress has never imposed a federal income tax upon sovereign states, their political subdivisions, or other entities that are an integral part of the state. This exemption is nowhere written in the tax code. Instead, this *de facto* exemption has applied since 1913 because the IRS has acknowledged that states are not "corporations, associations, trusts or individuals" subject to income taxation under the Code. In considering the *de facto* tax-exempt status of state-created entities, the courts have used both the "sovereign power" test and the "integral part" test. Under either test, MET's petition for tax-exempt status under the *de facto* exemption fails.

The Internal Revenue Code does not define the term "political subdivision," but the term has been defined by Treasury regulations pertaining to the exemption of interest on state obligations as "any division of any State or local governmental unit which is a municipal corporation or which has been delegated the right to exercise part of the sovereign power of the unit." 26 C.F.R. § 1.103–1(b) (1992). Construing the regulation, courts have required entities seeking "political subdivision" status to be authorized to exercise at least one of three sovereign powers: the power of eminent domain, the power to tax, or the police power.

This "sovereign power" test was first recognized by the Second Circuit in two companion cases, *Commissioner v. Shamberg's Estate,* 144 F.2d 998 (2d Cir.1944), *cert. denied,* 323 U.S. 792, 65 S.Ct. 433, 89 L.Ed. 631 (1945), and *Commissioner v. White's Estate,* 144 F.2d 1019 (2d Cir.1944), *cert. denied,* 323 U.S. 792, 65 S.Ct. 433, 89 L.Ed. 632 (1945). In *Shamberg's Estate,* the court addressed whether interest on the New York Port Authority's bonds was excludable from gross

---

3. Moreover, if the fund has a shortfall, there will be tremendous political pressure on the legislature to pony up the difference.

4. In Letter Ruling 8825027, the IRS stated that MET's income would be taxed.

5. "Mr. Roberts [State Treasurer] said that if the state loses the case, the trust would not be harmed financially because it has been paying federal taxes. According to Ms. Keeley [executive director of the trust], the trust has paid a total of about $29 million in federal taxes. The trust currently has 55,000 contracts outstanding and $450 million of assets, she added." Karen Pierog, *Michigan Will Appeal Decision Finding that Prepaid Tuition is Not Tax–Exempt,* The Bond Buyer, Aug. 20, 1992, Vol. 300, No. 28969 at 2.

6. Other states have structured their pre-paid tuition programs differently than Michigan. *See, e.g.,* Pierog, *supra* note 5 ("William Montjoy, executive director of Florida's Prepaid Postsecondary Education Expense program, said ... Michigan's case would have no impact on Florida.... The Florida program is an integral part of the state government, he said, because it is a state agency with a budget funded by state appropriations.").

7. Section 511(a) of the Code includes state colleges and universities in the group of organizations subject to the unrelated business income tax.

income. The court found that the Authority was a political subdivision of New York and New Jersey because it was created by a contract between the two states and had maintained many sovereign powers, including the power of eminent domain and the police power. The Authority's police power included the power to subpoena, the power to issue orders and enforce orders against persons within its jurisdiction, and the power to maintain a uniformed police force. Although the Authority did not have the power to tax, the court found this did not jeopardize the Authority's tax-exempt status:

> Here the activities ... are exercised for a public purpose by an agency set up by the states and given many public powers, though not of taxation or control through the suffrages of citizens. It minimizes its public and political character to treat such an agency as a private corporation merely because of the lack of taxing power which is only one of the attributes of sovereignty.

*Shamberg's Estate*, 144 F.2d at 1005.

In *White's Estate*, the court considered whether the Triborough Bridge Authority was a political subdivision for the interest on its bonds to be tax exempt. The court found that the Authority was a political subdivision of the State of New York because the Authority was "plainly a subdivision of state government empowered to exercise governmental functions on behalf of the City of New York...." 144 F.2d at 1020. The Authority's powers included the power of eminent domain and the power "to make use of city agents, employees, and facilities, and to issue bonds for constructing the bridges." *Id.*

Other courts have followed this reasoning. In *Seagrave Corp. v. Commissioner*, 38 T.C. 247, 1962 WL 1078 (1962), the Tax Court recognized that an entity must be authorized to exercise a sovereign power to constitute a political subdivision. In rejecting several volunteer fire departments' claims that they were political subdivisions under the Code, the court held:

> [T]he volunteer fire companies perform a public function in the sense that they perform the same function that is generally carried on by municipal fire departments. But the volunteer fire companies here in-

volved ... [are] not created by any special statutes and they received no delegation of any part of the State's power. It is not enough that they perform a public service. They cannot be called a subdivision of the State unless there has been a delegation to them of some functions of local government.

*Seagrave*, 38 T.C. at 250. Likewise, later courts have held that the delegation of traditional sovereign authority is a crucial factor in determining whether an entity is a political subdivision. *See Texas Learning Technology Group v. Commissioner*, 958 F.2d 122, 126 (5th Cir.1992); *Philadelphia Nat'l Bank v. United States*, 666 F.2d 834, 839 (3d Cir.1981) (Temple University not a political subdivision because sovereign power has not been delegated), *cert. denied*, 457 U.S. 1105, 102 S.Ct. 2904, 73 L.Ed.2d 1314 (1982); *Old Colony Trust Co. v. United States*, 438 F.2d 684 (1st Cir.1971) (hospital not a political subdivision in part because did not exercise any sovereign powers).

I find this test helpful, but note that it should not be applied mechanically to grant or deny tax-exempt status to those entities that do or do not possess one of the three historic attributes of state sovereignty. For example, many public utilities have eminent domain powers, and many private colleges have private police forces. However, neither organization has been viewed as a candidate for tax-exempt status.

MET argues that it qualifies as a political subdivision of Michigan because: (1) it possesses the power of eminent domain; (2) it is created by statute for the specific purpose of carrying on a specified governmental program; (3) it has been delegated a part of the duty to foster education within the State, and among the police powers of Michigan is the constitutionally mandated and legislatively required power and duty to promote education within the State; and (4) it possesses the governmental powers of rule-making and conducting quasi-judicial hearings.

MET's assumption that it possesses the power of eminent domain is based on Mich. Comp.Laws Ann. § 213.23, which provides:

Any public corporation or state agency is authorized to take private property necessary for a public improvement or for the purposes of its incorporation or for public purposes within the scope of its powers....

The United States argues that any "theoretical power" of eminent domain that MET possesses is inadequate to confer tax-exempt status upon it, for the Trust's purpose is to invest money and it therefore is "inconceivable" that the Trust would ever need to invoke its alleged power of eminent domain. I find it unnecessary to decide whether MET possesses eminent domain power under Michigan law, for, even if it did, possession of such power in this case would be insufficient to grant MET tax-exempt status.

MET does not have the power of taxation, nor does it benefit from legislative appropriation of funds. Any money that it has received from the State was in the form of a loan that MET paid back immediately. Moreover, the State does not guarantee the continued liquidity of the fund. If MET became actuarially unsound, purchasers of MET contracts could not rely on the State to meet MET's promise that children's tuition to state universities will be paid. In addition, despite MET's arguments to the contrary, it has not established that it possesses the police power. Although the promotion of higher education is a governmental, public function that has been assumed by the states, the maintenance of a prepaid tuition fund is not the type of responsibility historically borne by the states.

My conclusion that MET is not entitled to the *de facto* exemption is buttressed by MET's failure to meet the "integral part" test for considering entities who seek tax-exempt status. In deciding whether an entity is an integral part of a state, courts have relied on six factors:

(1) whether it is used for a governmental purpose and performs a governmental function; (2) whether performance of its function is on behalf of one or more states or political subdivisions; (3) whether there are any private interests involved, or whether the states or political subdivisions involved have the powers and interests of an owner; (4) whether control and supervision of the organization is vested in public authority or authorities; (5) if express or implied statutory or other authority is necessary for the creation and/or use of such an instrumentality, and whether such authority exists; and (6) the degree of financial autonomy and the source of its operating expenses.

*See Rose v. Long Island R.R. Pension Plan,* 828 F.2d 910, 918 (2d Cir.1987) (quoting Rev. Rul. 57–128, 1957–1 C.B. 311), *cert. denied,* 485 U.S. 936, 108 S.Ct. 1112, 99 L.Ed.2d 273 (1988).

It is unnecessary to define the extent to which MET must meet all of the elements of this list. Even if it were necessary only to fulfill a substantial part of the requirements, MET would fail to meet at least elements (3), (4), and (6). Substantial private interests are involved in MET, for (put in its best light) it was conceived primarily to alleviate parents' fears about the affordability of higher education. Private individuals, and not public actors, have the right to receive distributions from the Trust, either in tuition payments or in cash. In addition, MET is an independent entity that is not controlled or supervised by the State. *See* Mich.Comp.Laws Ann. § 390.1425(1) ("The trust shall be within the department of treasury, but shall exercise its prescribed statutory powers, duties, and functions independently of the head of that department."). MET's funds are not commingled with the State's general revenue fund, ensuring that the State cannot "raid" the Trust. MET, then, has significant financial autonomy from the State, since the State does not guarantee MET's promise to provide the tuition payments of those beneficiaries who enroll in Michigan's state colleges and universities. MET also does not receive financial assistance from the State, but instead relies on the income it receives from its investments to pay for operating expenses. Although MET, a state-created entity controlled by board members selected by the governor, has an undeniable connection to the State, its activities and funding arrangements indicate that it is not integral to the functioning of the State.

## II.

Section 115 provides in relevant part as follows:

Gross income does not include—

(1) income derived from any public utility or the exercise of any essential governmental function and accruing to a State or any political subdivision thereof. . . .

26 U.S.C. § 115.

Plaintiffs contend that MET serves an essential governmental function, and the income earned eventually accrues to the State because much of it is used to make direct payments to Michigan public colleges and universities. The district court found that § 115 did not alter MET's tax status because the statute's accrual requirement was lacking in this case. Although I have no quarrel with that conclusion, I find that MET does not perform an essential governmental function and therefore does not meet § 115's standard for tax-exempt status. *See United States v. Maryland Savings–Share Ins. Corp.*, 400 U.S. 4, 7 n. 2, 91 S.Ct. 16, 18 n. 2, 27 L.Ed.2d 4 (1970) (upholding district court conclusion that section 115 exemption not applicable to non-profit corporation created by Maryland legislature with the object of insuring the accounts of shareholders of member savings and loan associations).

The phrase "essential governmental function" was defined long ago by the Supreme Court:

The true distinction is between the attempted taxation of those operations of the States essential to the execution of its governmental functions, and which the State can only do itself, and those activities which are of a private character. The former, the United States may not interfere with by taxing the agencies of the State in carrying out its purposes; the latter, although regulated by the State, and exercising delegated authority, such as the right of eminent domain, are not removed from the field of legitimate Federal taxation.

*Flint v. Stone Tracy Co.*, 220 U.S. 107, 172, 31 S.Ct. 342, 357, 55 L.Ed. 389 (1911). *See also South Carolina v. United States*, 199 U.S. 437, 461, 26 S.Ct. 110, 116, 50 L.Ed. 261 (1905) (limiting tax exemption to instrumentalities "of a strictly governmental character").

Plaintiffs contend that higher education in Michigan is an essential governmental function, and I agree. However, it does not necessarily follow that providing a tuition prepayment program for those state citizens who can afford it is an essential governmental function. *See Allen v. Regents*, 304 U.S. 439, 452, 58 S.Ct. 980, 986, 82 L.Ed. 1448 (1938) ("If it be conceded that the education of its prospective citizens is an essential governmental function of [a state], as necessary to the preservation of the State as is the maintenance of its executive, legislative, and judicial branches, it does not follow that if the State elects to provide the funds for any of these purposes by conducting a business, the application of the avails in aid of necessary governmental functions withdraws the business from the field of federal taxation."). Offering a program such as MET is not something that only the State itself can do. As noted earlier, investment of money is a quintessentially private function, and investment services similar to those of the Trust are available currently through private companies. *See* Lehman, *Social Irresponsibility*, 88 Mich.L.Rev. at 1042 n. 13.

In addition, if the MET program were discontinued, the State of Michigan would be harmed, if at all, only indirectly. The money involved in this program is entirely independent of the State, and thus dissolution of the Trust would not result in any monies flowing out of Michigan's general fund—unless the state legislature chose to bail out the Trust. Importantly, however, a bail out is not required by statute. To the extent that the MET program makes Michigan public colleges and universities more attractive to prospective students,[8] any shortfall in revenue

8. The correctness of this proposition is debatable. Neither party has offered statistical proof that MET has induced or will induce students to attend Michigan public colleges who would otherwise elect to matriculate elsewhere. It would

be surprising if this were the case to any large degree. MET is limited to beneficiaries who are residents of Michigan. Even without the MET program, then, those beneficiaries would be entitled to receive in-state tuition, a figure much less

from a decline in enrollments if MET were dissolved could be recouped through higher tuition and would not necessarily require additional appropriations from the Michigan legislature. MET does not serve an essential governmental function with such indirect and hypothetical injury to the State.

Plaintiffs respond by noting that MET is not an investment program, but instead guarantees prepaid tuition to state universities and colleges. I might take this argument more seriously if the State pledged its full faith and credit to the MET program, because then the State would suffer direct and measurable harm if the program failed. The State provides no such guarantee, however. Instead, the legislature at its discretion can decide to bail out the Trust if it becomes actuarially unsound. Thus, MET's pledge to purchasers is chimerical. It is not bottomed on any state guarantee, but rather on wise investment strategies and the correctness of its financial assumptions to ensure the continued soundness of its guarantee. I have already voiced my doubts on this subject.

### III.

The Code provides for exemption from taxation for certain charitable organizations. Under § 501(c)(3), an exemption exists for organizations

> organized and operated exclusively for ... charitable ... or educational purposes, ... no part of the net earnings of which inures to the benefit of any private shareholder or individual....

In addition, the Code exempts

> organizations not organized for profit but operated exclusively for the promotion of social welfare....

26 U.S.C. § 501(c)(4).

The presence of any substantial non-exempt purpose will destroy an organization's exemption under § 501, regardless of the number and importance of truly exempt purposes. *See Better Business Bureau v. United States*, 326 U.S. 279, 283, 66 S.Ct. 112, 114, 90 L.Ed. 67 (1945). While the plaintiffs are correct that the MET program provides public benefits to society at large in the form of a well-educated populace, I agree with the district court that the tuition guaranteeing service constitutes a substantial private purpose that destroys the Trust's exemption. Those who contract with MET are the principal beneficiaries of the plan. *See American Ass'n of Christian Schools Voluntary Employees Beneficiary Ass'n Welfare Plan Trust v. United States*, 850 F.2d 1510, 1513 (11th Cir.1988) (a trust providing insurance benefits to employees of tax-exempt associations failed to qualify for exemption under § 501(c)(3) or (c)(4) because trust had substantial private, non-exempt purpose of providing insurance in exchange for premiums). *See also Geisinger Health Plan v. Commissioner*, 985 F.2d 1210, 1217 (3d Cir.1993) (health plan benefits no one but its subscribers, and even though area in which the plan operates is underserved medically, the plan does not "primarily benefit the community"). In addition, MET restricts its reach to those able to pay, providing evidence that MET is a non-charitable organization under the Code. *See Federation Pharmacy Servs. v. Commissioner*, 625 F.2d 804, 807 (8th Cir. 1980) ("An organization which does not extend some of its benefits to individuals financially unable to make the required payments reflects a commercial activity rather than a charitable one.").

### IV.

Having concluded that none of plaintiffs' statutory arguments have merit, I now turn to plaintiffs' constitutional claims. Plaintiffs invoke the Tenth Amendment, the intergovernmental tax immunity doctrine, and the Guarantee Clause in support of their contention that MET's income from investments is exempt from federal income tax.

### A. Tenth Amendment

The Tenth Amendment provides that "[t]he powers not delegated to the United

---

than that paid by non-resident students. For residents, education from a Michigan public college or university would remain more attractive in terms of its cost than the education offered by private schools or out-of-state public schools.

States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." The Supreme Court's interpretation of the Tenth Amendment has undergone considerable change in the last several years. In *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), the Court relied on the Tenth Amendment to hold that Congress acted unconstitutionally when it attempted to apply federal minimum-wage laws to the States. To do so, according to the Court, "would impair the States' . . . [ability] to structure integral operations in areas of traditional governmental functions[.]" *Id.* at 852, 96 S.Ct. at 2474.

Several years later, the Court overruled *Usery* in *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). Rejecting as unworkable the "traditional governmental function" test, the Court concluded that "[a]ny rule of state immunity that looks to the 'traditional,' 'integral,' or 'necessary' nature of governmental functions inevitably invites an unelected federal judiciary to make decisions about which state policies it favors and which ones it dislikes." *Id.* at 546, 105 S.Ct. at 1015. It then found that "the principal and basic limit on the federal commerce power is that inherent in all congressional action—the built-in restraints that our system provides" through state participation in the national political process. *Id.* at 556, 105 S.Ct. at 1020. It is that process, the Court concluded, that "ensures that laws that unduly burden the States will not be promulgated." *Id.*

Plaintiffs have not demonstrated that the internal safeguards of the political process have failed in this case. *See South Carolina v. Baker*, 485 U.S. 505, 513, 108 S.Ct. 1355, 1361, 99 L.Ed.2d 592 (1988) (rejecting Tenth Amendment challenge to federal tax of certain bonds issued by state and local governments unless those bonds were issued in registered form because "here, the national political *process* did not operate in a defective manner"). The United States did not violate the Tenth Amendment in taxing MET's investment income.

## B. Intergovernmental Tax Immunity

The doctrine of intergovernmental tax immunity protects the federal government from state taxation. *See California State Bd. of Equalization v. Sierra Summit, Inc.*, 490 U.S. 844, 109 S.Ct. 2228, 104 L.Ed.2d 910 (1989). More significantly, it also protects state governments from federal taxation. The doctrine addresses both the imposition of a tax on states themselves and on parties with whom the States deal.

Under current intergovernmental tax immunity doctrine, the United States can tax any private parties with whom a state does business, even though the financial burden falls on the state, so long as the tax does not discriminate against the state, or those with whom it deals, in favor of the federal government. *See South Carolina v. Baker*, 485 U.S. at 523, 108 S.Ct. at 1366–67. In addition, at least some non-discriminatory federal taxes can be collected directly from the States even though a parallel state tax could not be collected directly from the federal government. *Id.* A tax is considered to be directly "on" the state when the levy falls on the state itself, "or on an agency or instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities." *Id.* at 523, 108 S.Ct. at 1367. My conclusion that MET is not an integral part of the State of Michigan forecloses plaintiffs' argument that the taxing of MET's investment income falls directly on the State. The only remaining concern is whether the tax on MET is discriminatory. *But see* Lehman, *Social Irresponsibility*, 88 Mich.L.Rev. at 1084 n. 116 (noting that the discriminatory element of the doctrine has "contracted dramatically" so that "most problems involving the doctrine concern disputes over whether a particular entity is part of the state").

Plaintiffs allege that the United States' taxing policy discriminates in that several federal programs—*i.e.*, the federal student loan program, the federal insurance program, the Federal Deposit Insurance Corporation, and the United States Post Office—operate with tax exemptions although they are similar to MET because they invest funds that they receive to support their goals. Al-

though some similarities exist between these programs and MET, I agree with the district court that, unlike MET, these federal programs do not function primarily as an investment service for individual beneficiaries. The more proper comparison is to private investment services whose income is taxed by the federal government. Thus, I find nothing discriminatory in the federal government's taxation of MET.

## C. Guarantee Clause

Finally, plaintiffs contend that federal taxation of MET conflicts with the Guarantee Clause, which provides that "[t]he United States shall guarantee to every State in this Union a Republican Form of Government." Plaintiffs argue that the power to tax MET amounts to a "substantial federal incursion," that will "destroy the legitimate interests of the states[.]"

I hesitate to reach the substantive question of the Guarantee Clause's effect on federal taxation. My hesitancy is not driven by plaintiffs' arguments, but follows from my conclusion that a federal tax on MET does not amount to a substantial federal incursion on Michigan's affairs. Having concluded that MET is not an integral part of the State of Michigan, I am hard-pressed to understand the significant incursion of which plaintiffs speak. The district court did not reach plaintiffs' main arguments, for it concluded that this was a nonjusticiable issue. In doing so, the court relied on frequent holdings by the Supreme Court that claims presented under the Guarantee Clause are "political questions" unable to be resolved by federal courts. *See Baker v. Carr,* 369 U.S. 186, 218–29, 82 S.Ct. 691, 710–16, 7 L.Ed.2d 663 (1962). Nevertheless, plaintiffs urge us to follow Justice O'Connor, who argued in dissent in *South Carolina v. Baker* that Guarantee Clause questions are justiciable. 485 U.S. at 531–34, 108 S.Ct. at 1371–72 (O'Connor, J., dissenting). Just as the Supreme Court has declined to answer this difficult question, *see New York v. United States,* —— U.S. ——, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992), I would decline here. I would leave it

to the Supreme Court in the first instance to enter this constitutional thicket.

I would affirm.